## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## TEXARKANA DIVISION

| | |
|---|---|
| BLUE CROSS BLUE SHIELD OF TEXAS, A DIVISION OF HEALTH CARE SERVICE CORPORATION, A MUTUAL LEGAL RESERVE COMPANY,<br><br>*Plaintiff*,<br><br>vs.<br><br>ZOTEC PARTNERS, LLC,<br><br>*Defendant*. | Case No.<br><br>**COMPLAINT** |

Plaintiff Blue Cross Blue Shield of Texas, a division of Health Care Service Corporation, a mutual legal reserve company ("BCBSTX"), brings this Complaint against Defendant Zotec Partners, LLC ("Zotec") and alleges as follows:

### INTRODUCTION

1.      This case arises from Zotec's abuse of federal legislation that was intended to shield patients from unexpected medical bills, reduce the overall cost of healthcare, and provide a fair process for determining *reasonable* out-of-network reimbursement to providers.

2.      The federal No Surprises Act ("NSA") was enacted to protect patients from receiving surprise medical bills when patients inadvertently receive care from out-of-network providers. The statute was also intended to provide a less-costly means to resolve disputes between providers and health plans over out-of-network reimbursement for certain services. Specifically, the NSA established a mechanism—called "Independent Dispute Resolution" or the "IDR

Process"—intended to efficiently resolve out-of-network disputes and *decrease* aggregate healthcare costs.[1]

3.      The IDR Process has not worked as intended. Congress directed that median in-network rates negotiated between payors and participating providers (defined by the NSA as the Qualified Payment Amount ("QPA")) be included as a key benchmark for resolving rate disputes with out-of-network providers for eligible items and services in the IDR Process. But instead, the IDR Process often results in awards that are many multiples of the median rates negotiated by in-network providers—and sometimes even greater than the provider's own billed charge for the services. Worse, despite Congress making the IDR Process available for only a narrowly defined scope of out-of-network services, hundreds of millions of dollars in awards have been issued on *ineligible* services.

4.      This case concerns fraudulent submissions made by Zotec, a medical billing company. Zotec has repeatedly defrauded BCBSTX, as well as the entities that oversee the IDR Processes (referred to as "IDREs"), by initiating thousands of disputes that Zotec knew were ineligible for the IDR Process. Zotec did so intending to overwhelm BCBSTX and the IDREs, in many cases depriving BCBSTX of any real opportunity to challenge whether an item or service was eligible for the IDR Process.

5.      Zotec has a long-history of having its billing practices questioned and scrutinized, including being sued by its own provider clients for, among other things, "systematic" misbilling

---

[1] *See* Office of Health Policy, Issue Brief, *Evidence on Surprise Billing:  Protecting Consumers with the No Surprises Act*, (Nov. 22, 2021), Available at: https://aspe.hhs.gov/sites/default/files/documents/acfa063998d25b3b4eb82ae159163575/no-surprises-act-brief.pdf.

"flaws" that could "expose[]" its provider clients to ""to legal risk from payers and patients alike.""[2]

6.      Zotec also has a long-held animus against payors and, in particular, BCBSTX. Zotec's Vice President of Regulatory Affairs & Industry Liaison, Ed Gaines, has referred to BCBSTX as "1 of the worst."[3]

7.      When the NSA was enacted, Zotec saw an opportunity to game the new system. Zotec's strategy was simple: overwhelm the IDR Process with ineligible items and services, often in ways calculated to increase administrative review time and cost, and profit from the resulting improper awards.

8.      To do so, Zotec systematically submits false attestations and misrepresentations to BCBSTX, IDREs, and federal agencies to make the underlying services and items appear eligible when, in fact, they are not. For example:

   a. The IDR Process has strict timing requirements, including that an "open negotiations period" must be initiated by a provider within 30 days of payment for a given item or service and the formal IDR Process can only be initiated within four days after an initial open negotiation period lapses. Zotec intentionally initiates formal IDR proceedings without having initiated any open negotiations period or outside the timeframe allowed by statute by misrepresenting to BCBSTX, IDREs, and the U.S. Department of Health and Human Services ("HHS") the applicable dates that services were provided, the dates claims were adjudicated, and the dates that open negotiation periods commenced. Notably, more than 21% of all IDRs initiated by Zotec are more than 50 days past the deadline to initiate, with an additional 11% of all IDRs more than 100 days late.

   b. Only certain types of health benefit plans are eligible for the IDR Process. Zotec initiates IDR Processes for health benefit plans that it knows are not eligible,

---

[2] Marty Stempniak, *Radiology groups exchange lawsuits with vendor, alleging ongoing billing issues*, Radiology Business, (September 18, 2021), Available at: https://radiologybusiness.com/topics/healthcare-management/healthcare-economics/radiology-groups-zotec-lawsuits-billing-issues

[3] X, @EdGainesIII, (May 8, 2022), Available at: https://x.com/EdGainesIII/status/1523354712766300160.

including after BCBSTX informs Zotec that the applicable health benefit plan is ineligible.

c. Zotec initiated nearly 200 overlapping IDR proceedings for the **same services or items** under both the federal IDR Process and the Texas state analogue process, even though the two IDR Processes' eligibility requirements are mutually exclusive. Put another way, Zotec sought (and received) duplicate payments for the same services, in two different IDR Processes, despite eligibility for one IDR Process rendering the service ineligible for the other.

d. Zotec initiated duplicate IDR Processes for the same underlying service, despite the fact that a service should only be subject to a single IDR Process. This has allowed Zotec to receive multiple IDR awards on the same service—including in instances where the underlying service is ineligible for the IDR Process in the first instance.

9. Zotec has enacted strategies to minimize resistance to its ineligible IDR Process submissions. Chief among these tactics is Zotec's self-described "[u]se [of] strategic planning for batching to maximize revenue gain."[4] "Batching" refers to the submission of multiple items and services into a single IDR Process. Zotec has used batching to overwhelm BCBSTX's ability to meaningfully contest eligibility and, upon information and belief, the IDREs ability to assess eligibility. Specifically, on average, Zotec includes 66 different items or services in a single IDR submission. Zotec also often initiates open negotiations and formal IDRs around holidays to inhibit BCBSTX's ability to respond during the IDR Process's small window to lodge an objection to eligibility, effectively hiding the fact it was submitting ineligible services or items to the IDR Process.

10. Zotec also touts its strategy of "[b]uild[ing] relationships" with IDREs that oversee and render awards in the IDR Process.[5] Notably, these IDREs are paid their administrative fees only when they issue an award with a payment determination, while they do *not* receive any

---

[4] Ed Gaines, No Surprises Act:  The Last Act or More to Come?, Available at: https://content-cdn.sessionboard.com/content/fAYArvqFR0umRtrRFTSt_No%20Surprises%20Act-The%20Last%20Act%20or%20More%20to%20Come_Gaines.pdf.
[5] *Id.*

compensation if they dismiss a dispute due to ineligibility of the service.[6] Zotec understands and improperly exploits the incentive IDREs have to overlook eligibility issues.

11.    As a result of its illegal conduct, Zotec has wrongly obtained awards from BCBSTX. In addition, Zotec's improper submissions have caused BCBSTX to incur administrative fees that were not properly owed, and additional administrative and staffing expenses, all of which continue to accrue due to Zotec's continued improper submissions.

12.    BCBSTX now brings this action to recover its damages and to bar Zotec from continuing to submit ineligible claims into the IDR Process.

## THE PARTIES

13.    Plaintiff BCBSTX is an unincorporated division of Health Care Service Corporation, a mutual legal reserve company incorporated in Illinois with its principal place of business in Illinois. BCBSTX offers a full spectrum of insured health care plans and administrative services for government and employer-sponsored self-funded health plans, serving over 8 million members in Texas and with members in all 254 counties.

14.    Defendant Zotec Partners, LLC is a limited liability company incorporated in the state of Indiana with a principal place of business at 1460 North Meridian Street, Carmel, IN, 46032. According to Zotec's filings in other courts,[7] it has four members:

    a.    Zotec Solutions, Inc., an Indiana corporation with its principal place of business in Indiana.

---

[6] 42 U.S.C. § 300gg-111(c)(5)(F).
[7] *See, e.g.*, ECF No. 1 in *Specialists in Medical Imaging, Inc. v. Zotec Partners, LLC*, Case No. 1:17-cv-01395-MMM-JEF (C.D. Ill. Aug. 30, 2017).

b.    ZSI Holdings, LLC, a single-member Indiana limited liability company with its principal place of business in Indiana. ZSI's sole member resides in and is a citizen of Indiana.

c.    HealthCare Management Partners, LLC ("HMP"), a California limited liability company with its principal place of business in California. HMP's members include individuals, corporations, limited liability companies, trust companies, and several living and family trusts. None of the individual members of HMP reside in or are citizens of Illinois. None of the corporations that are members of HMP are incorporated in or have their principal place of business in Illinois. None of the trustees of any family or living trust or any trust company that is a member of HMP are citizens of Illinois. None of the members of the limited liability companies that are members of HMP are citizens of Illinois. The states of citizenship of HMP's members include California, Indiana, Delaware, Colorado, Nevada, Connecticut, New York, Georgia, Florida, and Massachusetts. None of the members of HMP reside in, are citizens of, are incorporated in, or have their principal place of business in Illinois.

d.    EMM Investments, LLC, which is a Texas limited liability company with its principal place of business in Texas. The members of EMM are individuals who reside in and are citizens of Washington, Alabama, and Texas. None of the members of EMM reside in, are citizens of, are incorporated in, or have their principal place of business in Illinois.

**JURISDICTION AND VENUE**

15.     This Court has subject-matter jurisdiction over this matter pursuant to 28 U.S.C § 1332 because there is complete diversity amongst the plaintiff and defendant, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

16.     Plaintiff is a mutual legal reserve company incorporated in Illinois and with its principal place of business in Illinois.

17.     As laid out above, Defendant Zotec is a citizen of the states of Indiana, California, Delaware, Colorado, Nevada, Connecticut, New York, George, Florida, Massachusetts, Alabama, Texas, and Washington.

18.     This Court has specific jurisdiction over Zotec because Zotec systematically and continuously conducts business in Texas, including committing the acts that give rise to this lawsuit. Specifically, as part of this scheme, Zotec purposefully directed its services towards Texas providers and established continuing business obligations there. Indeed, the vast majority of ineligible claims submitted by Zotec that gave rise to this lawsuit were submitted on behalf of Texas providers who rendered services to Texas residents. Moreover, upon information and belief, Zotec knew that its scheme would most impact health benefit plans and plan sponsors within Texas. Finally, Zotec has offices in Texas.

19.     Venue is proper in this District under 28 U.S.C. § 1391 because "a substantial part of the events or omissions giving rise to the claim[s]" in this action occurred in this District. 28 U.S.C. § 1391(b)(2). Specifically, Zotec targeted its actions towards BCBSTX, which has its main Texas campus in Richardson, Collin County, which is in this District. In addition, medical services were reportedly rendered to BCBSTX's members in this District (among other places), and Zotec

improperly initiated hundreds of IDR Processes on behalf of providers within this District, including in Houston, Liberty, and Nacogdoches counties.

## BACKGROUND ON BALANCE BILLING

20.     Health benefit plans, such as those offered by BCBSTX, contract with healthcare providers, making the provider "participating" or "in network" for that plan.

21.     Provider network contracts set forth, among other things, rates at which the health benefit plan will reimburse the provider for covered services rendered for a plan member. These rates apply instead of the "billed charges" a provider might otherwise hold out as the price for its services.

22.     When a member receives covered healthcare from an in-network provider, the member is typically only responsible for the payment of a co-pay, deductible, and/or co-insurance payment. The in-network provider is also prohibited from seeking charges from the patient in excess of the rates agreed upon in the network agreement.

23.     On the other hand, if a provider is "out of network," they have no network agreement with the applicable health plan. This means there is no agreed-upon rate for covered services rendered by an out-of-network provider, nor are there limits on what a provider may charge a patient for such services. Out-of-network providers often set rates that are entirely divorced from the cost-of-care and/or reasonable profitability.

24.     Out-of-network providers could historically "balance bill" patients for their excess charges above the plan's maximum allowed amount. And because providers set their rates unilaterally, the charges were often inflated, leading to patients receiving massive balance bills. Providers that balance billed patients could impose significant hardship on their patients, including bankruptcy.

25.     Balance bills became especially prevalent in instances where members could not choose to receive care from an in-network provider, such as emergency care. In other situations, the member may have chosen a network facility, but certain providers staffing the facility—like anesthesiologists—were out-of-network and billed separately.

26.     In both instances, out-of-network providers could "surprise" patients with huge balance bills. These balance bills were often inflated or were arbitrary amounts that had no relation to the cost of care, market rates, or any other measure of reasonable value for the services. And often, patients would have no idea they had received care from an out-of-network provider until they received a balance bill for thousands of dollars.

## THE FEDERAL NO SURPRISES ACT

27.     To combat predatory balance billing, Congress enacted the NSA in 2020 as an attempt to end "surprise medical bills."  Pub. L. No. 116-260, div. BB, tit. I, 134 Stat. 1182, 2758–2890 (2020).

28.     The NSA was designed to: (1) shield patients from unexpected out-of-network bills, and (2) establish a payment that is "fair to both providers and plans that also does not increase aggregate healthcare system costs."[8]

29.     The NSA established the IDR Process for resolving payment disputes on claims between out-of-network providers and health plans. *See* 42 U.S.C. § 300gg-111(c).

30.     The IDR Process has strict eligibility requirements, including but not limited to the following:

a.     *First*, the IDR Process is not available where a "specified state law" applies—*i.e.*, a state law that provides a method for determining the total amount payable

---

[8] *Evidence on Surprise Billing: Protecting Consumers with the No Surprises Act*, *supra* note 1.

to an out-of-network provider for covered services that otherwise fall within the scope of the NSA, 42 U.S.C. § 300gg-111(a)(3)(I). One such instance is Texas' analogue to the NSA, Texas Senate Bill 1264 ("Texas State IDR Process").

b.      *Second*, the services and items at issue must be within the NSA's scope—meaning that the services must be rendered by an out-of-network provider rendering emergency services, non-emergency services at participating facilities, or air ambulance services. 42 U.S.C. § 300gg-111(c)(1)(B).

c.      *Third*, the services and items must not have been the subject of a previous award issued through the IDR Process. 42 U.S.C. § 300gg-111(c)(1)(B).

d.      *Fourth*, a provider[9] must comply with the statutorily-ordered timeline for each step of the IDR Process, including:

    i.      Initiating open negotiation (an "Open Negotiation" period) via written notice as prescribed in the Provider Claim Summary, which must be given within 30 days of the health plan's first notice of payment or denial for the item or service. *See* 42 U.S.C. § 300gg-111(c)(1)(A).

    ii.      Exhausting the 30-day Open Negotiation period. *See* 42 U.S.C. § 300gg-111(c)(1)(B).

    iii.      Initiating a formal IDR dispute within four business days after exhaustion of the open negotiations period. 42 U.S.C. § 300gg-111(c)(1)(B).

---

[9] Either party may initiate the IDR Process, but the Process is overwhelmingly initiated by providers. *See* Centers for Medicare & Medicaid Services, *Independent Dispute Resolution Reports*, Federal IDR Public Use Files for 2024 Q3 and Q4 (as of May 28, 2025), available at: https://www.cms.gov/nosurprises/policies-and-resources/reports.

e.    *Fifth*, a provider submitting multiple claims together (referred to as "batched" claims) must comply with batching criteria. 45 C.F.R. § 149.510(a)(2)(i) ("Batched items and services means multiple qualified IDR items or services that are considered jointly as part of one payment determination by a certified IDR entity for purposes of the Federal IDR process.").

31.    Generally, the IDR process works as follows:

a.    Within 30 days of initial payment or notice of denial on a claim, the provider must initiate by providing written notice and participate in "open negotiations" with the applicable health benefits plan. 42 U.S.C. § 300gg-111(c)(1)(B);

b.    If the provider exhausts the 30-day open negotiations period and the parties do not agree upon a payment amount, the provider can then initiate the formal IDR Process through an online portal within 4 days after the open negotiations period has lapsed. *Id.*;

c.    To initiate the formal IDR Process, the provider has to answer various questions in the online portal related to the medical services and claim being disputed, then complete a Notice of IDR Initiation Form;

d.    The parties then select, or have appointed, an Independent Dispute Resolution Entity ("IDRE"). 42 U.S.C. § 300gg-111(c)(4)(F);

e.    The health plan has only four business days after the provider has initiated the formal IDR Process to object that the items or services in dispute are not eligible;[10]

---

[10] Federal Independent Dispute Resolution (IDR) Process Guidance for Disputing Parties, December 2023 Update to October 2022 Guidance , § 5.5, Available at: https://www.cms.gov/files/document/federal-independent-dispute-resolution-guidance-disputing-parties.pdf ("If the non-initiating party believes that the Federal IDR Process is not applicable, the non-initiating party must notify the Departments by submitting the relevant information through the Federal IDR portal . . . not later than 1-business-day after the end of the 3-business-day period for certified IDR entity selection").

f.    After being appointed, the IDRE has only three business days to submit its attestations to the Departments. To proceed forward in the dispute, the IDRE must attest that it does not have a conflict of interest, and that the IDRE has determined that the claims in dispute are eligible for the IDR Process. An IDRE who does not make this evaluation within the 3 business day period will be fired and the parties must select another IDRE.[11] 45 C.F.R. § 149.510(c)(1)(v), 29 C.F.R. § 2590.716-8(c)(1)(v);

g.    After determining that the IDR Process applies, the provider and health plan each submit an offer to the IDRE. The parties are not entitled to see, nor rebut, each other's submissions to the IDRE. 42 U.S.C. § 300gg-111(c)(5)(B);

h.    The IDRE then selects one party's offer, taking into account the "qualifying payment amount" ("QPA"), which is the health benefit plan's median in-network rate for the same service, and other circumstances related to the provider and patient. 42 U.S.C. § 300gg-111(c)(5)(C);

i.    This decision is then binding upon the parties, subject to limited judicial review, and the non-prevailing party is responsible for administrative and IDRE fees. 42 U.S.C. § 300gg-111(c)(5)(F).

32.    The IDR Process is costly. The IDREs that oversee this Process charge administrative fees, which are the responsibility of the party that loses the dispute. 42 U.S.C. § 300gg-111(c)(5)(F)(i). Often these administrative fees exceed the value of the underlying reimbursement dispute.

---

[11] If the IDRE finds the claims in dispute are not eligible, the Process ends, and the IDRE is not paid. 42 U.S.C. § 300gg-111(c)(5)(F).

33.    To avoid the filing of ineligible disputes under the IDR Process, providers are required to provide information and attest that the service meets eligibility requirements when initiating a dispute.

34.    As outlined below, it is nearly impossible to "accidentally" submit an ineligible claim to the IDR Process.

35.    Once the open negotiation period discussed above has been exhausted, the process of initiating a dispute under the IDR begins with providers having to input information into an online portal created by HHS.[12]

36.    The portal's first page confirms a party initiating IDR must provide an "[a]ttestation that the items and services under dispute are qualified IDR items or services":[13]

> **Along with the general information you'll need to start your Federal IDR dispute process, provide:**
> - Information to identify the qualified IDR items or services (and whether they are designated as batched or bundled items or services)
> - Dates and location of qualified IDR items or services
> - Type of qualified IDR items or services such as emergency services and post-stabilization services
> - Codes for corresponding service and place-of-service
> - Attestation that qualified IDR items or services are within the scope of the Federal IDR process
> - Your preferred certified IDR entity

---

[12] *See* Department of Health & Human Services, *Notice of IDR Initiation*, Available at: https://nsa-idr.cms.gov/paymentdisputes/s/.
[13] 45 C.F.R. § 149.510(b)(2)(iii)(A)(6).

37.     Next, the provider must select the "Health Plan Type" from enumerated dropdown options, which are limited to those types of plans that are potentially eligible for the IDR Process:



38.     In response to some selections, including for the selection of a certain type of benefits plan, the portal returns an alert about ineligibility; for instance:

⚠ **This dispute is not eligible for the federal IDR process because the date of service you provided is before 1/1/2022.**

39.     The last step in the Process is submission of the Notice of IDR Initiation form,[14] which contains information proscribed by HHS.

---

[14] Departments of the Treasury, Labor, and Health and Human Services (Departments) and the Office of Personnel Management, *Notice of IDR Initiation Instructions*, OMB Control No. 1210-0169, Available at: https://www.dol.gov/sites/dolgov/files/ebsa/laws-and-regulations/laws/no-surprises-act/notice-of-idr-initiation.pdf.

40.    Among other things, this form includes fields for the provider to complete, including information regarding the "Qualified IDR Item(s) or Service(s)":

**[INFORMATION TO BE COMPLETED BY THE INITIATING PARTY]**

1.  **Initiating party is (check one):**  ☐ **Plan** ☐ **Issuer** ☐ **FEHB Carrier** ☐ **Health care provider**
☐ **Health care Facility** ☐ **Provider of air ambulance services**

2.  **Qualified IDR Item(s) or Service(s)** [insert additional rows as appropriate]

| | Description of qualified IDR item(s) or service(s) | Claim Number | Batched (Y/N) | Date of item(s) or service(s) | Location where item(s) or service(s) were furnished (include state) | Service code(s) | Place-of-service code(s) | Type of qualified item(s) or service(s) | Qualifying Payment Amount | Cost Sharing Amount Allowed | Initial Payment Amount for the item(s) or service(s), if applicable |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | | | | | | | | | | | |
| 2. | | | | | | | | | | | |
| 3. | | | | | | | | | | | |
| 4. | | | | | | | | | | | |
| 5. | | | | | | | | | | | |

41.    The form also requires the provider to supply the "Name of the Plan/Issuer/Carrier" and to select the "Type of Plan" from an enumerated list:

3.  **Group Health Plan/Health Insurance Issuer/FEHB Carrier Information**

Name of Plan/Issuer/Carrier: _____

Type of Plan (select one):

   ☐ Federal Employees Health Benefits (FEHB) plan:

      If FEHB plan, enter 3-digit Enrollment Code: _____

   ☐ Individual health insurance plan

   ☐ Non-federal governmental plan (i.e., state and local government plan)

   ☐ Church plan

   ☐ Private employment-based group health plan (i.e., an ERISA plan)

      If ERISA plan, is the ERISA plan self-insured? Y/N _____

   ☐ Unknown

**Contact Information**

42.    The provider must also include the date it commenced the open negation period:

-15-

> 5. Indicate the commencement date of the open negotiation period:
> _____

43.    Finally, the provider must sign and date an "**ATTESTATION**" that the "item(s) and/or service(s) at issue are qualified item(s) and/or services(s) within the scope of the Federal IDR process":

> **8. ATTESTATION:**
>
> ___ I, the undersigned initiating party (or representative of the initiating party), attests that to the best of my knowledge the preferred certified IDR entity does not have a disqualifying conflict of interest and that the item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process.
>
> **Initiating Party (or Representative of the Initiating Party):** _____
>
> **Print Name:** _____     **Date:** _____

## MISUSE AND ABUSE OF THE NSA IDR PROCESS

44.    When the NSA was passed in 2021, it was estimated that there would be approximately 17,435 disputes submitted to the IDR Process each year.[15] Those predictions turned out to be a drastic underestimation.

45.    Providers submitted 390,346 disputes to the IDR Process in the second half of 2023 alone. In 2024, they initiated 1.5 million disputes—a 300% year-over-year increase, and more than 70 times the aforementioned annual case load Congress anticipated.

46.    Two factors are motivating providers to drive these excessive volumes: (1) providers winning a disproportionate amount of these disputes, and (2) the unreasonably high rates that providers are proposing as "offers" in the IDR Process.

---

[15] Requirements Related to Surprise Billing, 87 Fed. Reg. 52618 (Aug. 26, 2022) (Final rules under the No Surprises Act).

47.     Data released by the Center for Medicare and Medicaid Services (CMS) shows that, for the second half of 2024, approximately 85% of IDR disputes were decided in favor of providers.[16]

48.     Moreover, awards in favor of providers often far exceed market rates for the same services by the same types of providers. The IDR Process median awarded rate is now four times more than the QPA.[17] In other words, out-of-network providers who participate in the IDR Process are often getting four times more than the typical rates contracted providers receive for the same services in the same market.

49.     The additional costs associated with the IDR Process are "generating billions of dollars in extra costs for the healthcare system" without delivering more or better services to patients.[18]

50.     Researchers have commented that "absent corrective action from policymakers, patients will ultimately bear the cost, through higher premiums and the administrative overhead of an increasingly exploited arbitration process."[19]

51.     While these abuses and distortions are big issues, they are driven by a small number of entities. A handful of companies are attempting to weaponize the NSA IDR Process to extract excessive rates. These companies are major drivers of both the increase in the number of IDR

---

[16] *See* Centers for Medicare & Medicaid Services, *Independent Dispute Resolution Reports*, Federal IDR Public Use Files for 2024 Q3 and Q4 (as of May 28, 2025), available at: https://www.cms.gov/nosurprises/policies-and-resources/reports.
[17] *See id.*
[18] Rebecca Pifer, HealthcareDive, *No Surprises dispute resolution is creating billions of dollars in extra costs, could raise premiums: analysis*, (Aug. 27, 2025), Available at: https://www.healthcaredive.com/news/no-surprises-dispute-resolution-driving-health-costs/758713/.
[19] Lawson Mansell & Sage Mehta, Niskanen Center, *New data shows No Surprises Act arbitration is growing healthcare waste*, (June 18, 2025), Available at: https://www.niskanencenter.org/new-data-shows-no-surprises-act-arbitration-is-growing-healthcare-waste/.

disputes being initiated and the dramatic increase in the provider IDR offer amounts observed in the first two quarters of 2024.[20]

52.    On information and belief, it is "middleman organizations"—billing or "revenue cycle management" companies like Zotec—driving the excessive volume of IDR disputes, including disputes for ineligible items and services, that ultimately increases costs across the entire healthcare system.

## ZOTEC

53.    Zotec, founded in 1998 by T. Scott Law in Indiana, is a revenue cycle and practice management company for healthcare providers. It advertises itself as being able to "accelerate every phase of the revenue cycle—from coding to collections"[21] and touts "millions recovered annually."[22]

54.    Zotec's billing practices have been the subject of regular scrutiny, including through legal actions brought by its own clients.[23]

55.    For instance, in December of 2018, two radiology providers filed suit against Zotec and contended, among other things, that "Zotec's general performance fell well below industry

---

[20] *See Independent Dispute Resolution Reports*, *supra* note 17.

[21]    Zotec    Partners,    *End-to-end    Revenue    Cycle    Management*,    Available    at: https://zotecpartners.com/e2e-rcm/.

[22] LinkedIn, Zotec Partners, Available at: https://www.linkedin.com/company/zotec-partners/.

[23] *See* Marty Stempniak, *Radiology groups exchange lawsuits with vendor, alleging ongoing billing issues*,    Radiology    Business,    (Sept.    18,    2021),    Available    at: https://radiologybusiness.com/topics/healthcare-management/healthcare-economics/radiology-groups-zotec-lawsuits-billing-issues.

expectations for revenue cycle management companies in several areas."[24] These providers further alleged that Zotec committed "a long list of billing errors" and "coding errors."[25]

56.    As another example, in 2021, California Managed Imaging Medical Group filed suit against Zotec alleging that Zotec had engaged "in gross misconduct and, separately, has not complied with applicable law . . . ."[26] Specifically, California Managed Imaging Medical Group alleged, among other things, that Zotec submitted "Inaccurate Radiology Bills" and had "systemic" misbilling "flaws."[27] California Managed Imaging Medical Group later alleged that these issues "expose[d]" it "to legal risk from payers and patients alike."[28]

57.    Upon information and belief, Zotec also has a long-held animus against health plans and, in particular, BCBSTX.

58.    For instance, Zotec's Vice President of Regulatory Affairs & Industry Liaison, Ed Gaines, has referred to Blue Cross Blue Shield as "one of the poster children for 'bad payor' behavior."[29] Gaines has specially referred to BCBSTX as "1 of the worst."[30]

59.    Upon information and belief, fueled by its desire to generate additional revenue and its anti-health plan animus, Zotec's work on behalf of providers has become considerably focused on the NSA in recent years.

---

[24] Amend. Compl. ¶ 26, *Imaging Healthcare Specialists, LLC, et al. v. Zotec Partners, LLC*, Case No. 1:18-cv-4048 (S.D. Ind. Jan. 24, 2019).
[25] *Id.* ¶ 39.
[26] Compl. at ¶ 3, *California Managed Imaging Medical Group, Inc., et al. v. Zotec Partners, LLC*, Case No. 21STCV26890 (L.A. Sup. Ct. July 21, 2021).
[27] *Id.* ¶¶ 22–27.
[28] Marty Stempniak, *Radiology groups exchange lawsuits with vendor, alleging ongoing billing issues*, Radiology Business, (Sept. 18, 2021), Available at: https://radiologybusiness.com/topics/healthcare-management/healthcare-economics/radiology-groups-zotec-lawsuits-billing-issues.
[29] X, @EdGainesIII, (Sept. 7, 2024), Available at: https://x.com/EdGainesIII/status/1832429463646200187.
[30] @EdGainesIII, *supra* note 3.

60.     As early as August of 2019—more than two years before the NSA was enacted—Zotec, including through its Political Action Committee, began discussing the "impact [to] profitability" that federal surprise billing legislation could have for providers.[31]

61.     After the NSA was rolled out, Zotec teamed up with providers to handle IDRs on their behalf.[32]  Zotec advertises itself as "experts" that "build[] a robust case for out-of-network positioning through the IDR process."[33]

62.     Central to Zotec's IDR strategy is arguing that the QPA—the median in-network rate—"is insufficient reimbursement."[34]

63.     Amongst strategies to recover amounts higher than the QPA for its provider clients, Zotec advises that providers should "[b]uild relationships w[ith] IDREs" and "[u]se strategic planning for batching to maximize revenue gain."[35]

---

[31] *See* Becker's Hospital Review, *Surprise Billing Legislation - Overview, Response, and Future Implications*, (Aug. 16, 2019), Available at: https://www.youtube.com/watch?v=RJps0omOazk.

[32] Zotec Partners, Zotec Partners Delivers a Streamlined Approach to In and Out of Network Claims Processing, (Aug. 1, 2024), Available at: https://zotecpartners.com/resources/zotec-partners-delivers-a-streamlined-approach-to-in-and-out-of-network-claims-processing/.

[33] *Id.*

[34] Ed Gaines, No Surprises Act:  The Last Act or More to Come?, *supra* note 4.

[35] *Id.*

**Building Your Case: your goal=the QPA is insufficient reimbursement because…**

➢**Use objective hospital quality of care measures and/or MIPS quality data to support why the QPA is not sufficient.**
    ➢**Single case agreement settlement data can augment your ON process and final offer.**
    ➢**How does the QPA compare to that data?**
➢**Know your patient and community demographic:  trauma center, stroke center, health plan "center of excellence" + teaching hospital.**
➢**Use strategic planning for batching to maximize revenue gain**
➢**Build relationships w/ the IDREs.**
➢**Show documented "good faith" in all submissions.**

34

### ZOTEC'S ABUSE OF THE NSA IDR PROCESSES

64.     Zotec implemented a scheme that has damaged BCBSTX to the tune of millions of dollars. Upon information and belief, the scheme works as follows.

65.     First, Zotec establishes relationships with out-of-network providers, largely emergency medicine physician staffing or radiology medical groups in Texas.

66.     After one of these providers renders care to a patient covered by a health plan, the provider authorizes Zotec to initiate out-of-network payment disputes related to those services, including through the IDR Process.

67.     Next, Zotec stockpiles claims and bulk-submits large quantities of "batched" claims into the IDR Processes all at once. Upon information and belief, this tactic (among others) is used to overwhelm the health plan's ability to meaningfully respond or contest eligibility.

68.     In doing so, and in order to initiate the Open Negotiation period to begin a formal IDR dispute, Zotec makes a series of misrepresentations in its submissions to the IDR portals—

misrepresentations that are transmitted to BCBSTX, IDREs, and federal governmental bodies—to make an item or service appear eligible for the NSA (when it was not), including:

a. Misrepresenting that the patient had a health benefit plan administered or insured by BCBSTX;

b. Misrepresenting the type of health benefit plan applicable to a given service;

c. Misrepresenting the type of underlying medical services provided;

d. Misrepresenting the date that the underlying medical services were provided;

e. Misrepresenting that the parties participated in an Open Negotiation period and the date of the same;

f. Misrepresenting that the provider filed an appeal with the health plan; and,

g. Attesting that the items or services are "qualified IDR items or services," and that they "are within the scope of the Federal IDR process."

69.    Zotec's *en masse* batch submissions make it materially more difficult for BCBSTX to engage in the IDR process, including meaningfully assessing and contesting eligibility issues. Upon information and belief, Zotec's batch submissions also make it more difficult for IDREs to assess and rule on eligibility issues.

70.    Notably, BCBSTX often informs Zotec that an underlying item or service is ineligible for the IDR Process during the Open Negotiation Phase. Below is one such example of BCBSTX informing Zotec of ineligibility issues with services or claims during the Open Negotiation Phase:



71.    Despite knowing, and often being informed, that the items and services are not eligible for the respective IDR Process, Zotec moves ahead in initiating the formal IDR Processes by further misrepresenting that the items and services are eligible when they are not.

72.    As a result of these misrepresentations, which are relied upon by BCBSTX and the IDREs, Zotec is able to cram ineligible items and services through the IDR Process, where Zotec can procure awards on ineligible items and services, typically at excessive rates.

73.    BCBSTX is then forced to pay administrative fees in connection with these improperly granted awards. There are also significant overhead costs and expenses incurred by BCBSTX because of the volume of ineligible items and services.

74.     The end result of Zotec's fraudulent submissions of ineligible items and services in IDR disputes is that BCBSTX and its plan sponsors are having awards and IDRE fees levied against them related to items and services that are not and were not eligible for the NSA IDR Process in the first place.

75.     The following are just a few representative examples where Zotec improperly procured awards under the NSA IDR Process for ineligible items and services using fraudulent and false representations.

### DISP-4012351 (State Specified Law Applies)

76.     On June 3, 2025, EM Alliance Texas PPLC ("EMAT") provided medical services to a BCBSTX member with a fully-insured health benefits plan.

77.     On June 11, 2025, BCBSTX sent EMAT a provider claim summary, in addition to a standard "835" remittance advice, explaining that the services had been reimbursed at $████. The provider claim summary stated that the services were subject to "Texas law" and that if EMAT "disagree[d] with the payment amount, [it] can request mediation or arbitration" under the **Texas State IDR Process**:

> IF YOU DISAGREE WITH THE PAYMENT AMOUNT, YOU CAN REQUEST MEDIATION OR ARBITRATION BY SUBMITTING A REQUEST AT WWW.TDI.TEXAS.GOV. ONCE SUBMITTED, PLEASE NOTIFY BCBSTX AT TX.PROVIDER.ARBITRATION@BCBSTX.COM.

78.     Nevertheless, Zotec initiated an open negotiations period for these services on July 23, 2025 in the **federal IDR Process.**

79.     In response, BCBSTX sent a letter explaining (again) that these services were ineligible for the federal IDR Process:



September 03, 2025
RE: ███████████████
HCSC CMS Registry Number:
CMS Registry Number:
Dear Em Alliance Texas Pllc:

We have received your request on July 23, 2025, disputing claim number
████████████ .

Items or services billed do not qualify for the NSA process. Eligible services will be noted on your Provider Claims Summary.

After further review, it has been determined State specified law applies to this item or service. As a result, the No Surprises Act IDR Process is not applicable.  The health plan type is PREM.

Claims for the following services, which are not subject to a specified state law, may be eligible for payment review under NSA if you don't have a contract with us.

· Emergency services or stabilization for an emergency
· Services provided by non-participating providers at a contracted facility
· Air ambulance Services

Sincerely,
Independent Dispute Resolution Team

80.     Still, Zotec initiated a formal federal IDR Process on September 5, 2025. To do so, Zotec made material misrepresentations to make these services appear eligible when Zotec knew they were not.

81.     *First*, Zotec represented that the applicable health plan type was "[e]ither [a] partially or fully self-insured ERISA group health plan":

**Notice of IDR Initiation**                OMB Control Number: 1210-0169 Expiration Date: 11/30/2025

**Dispute Reference Number: DISP-4012351**

**Qualification Questions**

Was the service in question provided prior to 1/1/2022?
No

I'm a(n):
Health care provider

Tax ID:                          National Provider Identifier (NPI):
332012020                        1902621329

Health Plan Type:
Either partially or fully self-insured ERISA group health plan

When did the open negotiation period start?
07/23/2025

82.    This was untrue. From the provider claim summary, "835" remittance advice, and letter sent by BCBSTX, Zotec knew that the applicable health benefit plan was fully insured and that the plan was only subject to the Texas State IDR Process. Nevertheless, Zotec submitted false information to make the claim appear eligible for the Federal IDR Process.

83.    *Second*, a representative of Zotec falsely attested that the "item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process":

☑ I, the undersigned initiating party (or representative of the initiating party), attest that to the best of my knowledge the preferred certified IDR entity does not have a disqualifying conflict of interest and that the item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process.

Signature:                       Date:
Josh Folds                       09/05/2025

84.    This, too, was untrue. Zotec had already received a letter from BCBSTX stating the applicable health benefits plan was fully-insured and therefore the underlying service was ineligible for the Federal IDR Process.

85.    Zotec's misrepresentations caused an award to be rendered against BCBSTX in the amount of $██████.

86.     This award is over 880% greater than the QPA (*i.e.*, median in-network rate) for these same services.

87.     On top of this, BCBSTX also incurred administrative expenses of $█.

88.     All of the foregoing was caused by Zotec's fraudulent and false misrepresentations in the IDR Process.

### DISP-2724847 (Failure to Timely Initiate Formal IDR)

89.     On March 3, 2024, River Oaks Emergency Physician ("River Oaks") provided services to a BCBSTX member.

90.     On March 6, 2024, a claim for these services was adjudicated and allowed by BCBSTX. BCBSTX also sent River Oaks a Provider Claim Summary detailing adjudication of this claim.

91.     On April 16, 2024, River Oaks sent BCBSTX notice of initiation of Open Negotiations for these services. That same day, BCBSTX sent River Oaks an offer to settle this claim that was equal to 212% of the QPA for this service:

**BlueCross BlueShield**
of Texas

April 16, 2024
RE: 0▮▮▮▮▮▮▮▮
Dear RIVER OAKS EMERGENCY PHYSICIAN ST:

We have received your open negotiation notice on April 16, 2024, disputing claim number
▮▮▮▮▮▮▮▮▮▮
You have provided an offer amount of $▮▮▮▮

BCBSTX rejects your offer and hereby makes a counter-offer of $▮▮▮▮.

If you accept our counter-offer, this will finalize the claim. We will issue payment according to the agreed-upon amount. Members will not be responsible for amounts above their cost-share.

If you reject our counter-offer, we will consider this negotiation request as closed. The items and services may be subject to a timely request for IDR, as provided under the NSA, and assessment of agency administration and IDR entity fees. IDR requests may be submitted to HHS upon conclusion of the 30-day open negotiation period.

You can respond to our counter-offer through Availity.

Sincerely,
The Independent Resolution Team

92.     As described above, and as the letter laid out, River Oaks had 30 days thereafter to initiate the formal IDR Process for these services.

93.     Nevertheless, there was no further correspondence between BCBSTX and River Oaks related to these services for many months.

94.     Then, on March 9, 2025—more than ***327 days*** after the completion of the Open Negotiations Period—Zotec initiated a formal IDR Process for these services.

95.     To do so, Zotec made material misrepresentations to make the claim appear eligible when it knew it was not.

96.     *First*, upon information and belief, in order to initiate the IDR Dispute, Zotec had to misrepresent the date on which the service was provided and/or when the Open Negotiations Period ended. Had Zotec inputted accurate information into the IDR portal regarding these dates, Zotec could not have proceeded forward with initiating a formal IDR.

97.     *Second*, Zotec attested that the "item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process." Again, however, this was not true because the services at issue were untimely by nearly a year.

98.     Zotec's misrepresentations caused an award to be rendered against BCBSTX in the amount of ▆▆▆▆.

99.     River Oaks' own billed charges were only ▆▆▆▆ for this same service. Thus, Zotec's misrepresentations caused an award against BCBSTX that was more than ***300% greater*** than River Oaks' own billed charges.

100.     This award is also ***over 5,000% greater*** than the QPA *(i.e.*, median in-network rate) for these same services.

101.     On top of this, BCBSTX also incurred administrative expenses of $▆▆.

102.     All of the foregoing was caused by Zotec's fraudulent and false misrepresentations in the IDR Process.

### *DISP-2266381 (Failure to Initiate Open Negotiations Period)*

103.     On June 7, 2024, ESS of Nacogdoches, LLC ("ESS") provided services to a BCBSTX member.

104.     On October 20, 2024, this claim was allowed by BCBSTX at $▆▆.

105.     Under the NSA, ESS then had 30 business days from the date it received BCBSTX's payment determination to initiate the IDR Open Negotiations Period, which was

November 14, 2024. A party must also initiate and then exhaust a 30-day Open Negotiations Period before initiating the formal IDR Process.

106. ESS never initiated an Open Negotiation Period for these services. Yet, on December 16, 2024, Zotec initiated a formal IDR Process on behalf of ESS. To do so, Zotec made material misrepresentations to make the claim appear eligible when it knew it was not.

107. *First*, Zotec represented that an Open Negotiation Period began on October 28, 2024:



108. This was not true, though, as BCBSTX had never received initiation of an Open Negotiations Period related to these services.

109. *Second*, Zotec attested that the "item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process":

> ☑ I, the undersigned initiating party (or representative of the initiating party), attest that to the best of my knowledge the preferred certified IDR entity does not have a disqualifying conflict of interest and that the item(s) and/or service(s) at issue are qualified item(s) and/or service(s) within the scope of the Federal IDR process.
>
> | Signature: | Date: |
> | --- | --- |
> | Zotec Partners | 12/16/2024 |

110.    This was also a misrepresentation because neither Zotec nor ESS had ever initiated and exhausted an Open Negotiations Period related to these services—which is required prior to initiation of a formal IDR Process.

111.    BCBSTX submitted an objection to the IDRE explaining that, among other issues, Zotec had failed to initiate and exhaust an Open Negotiations Period for these services:

> Objection to the following items or services. An open negotiation request must be initiated within 30 business days beginning on the day the Out of Network provider receives either an initial payment or notice. The initial Payment or Notice date and the initiating party submitted the open negotiation notice date are referenced with each claim below. Therefore, this submission is not eligible for the Federal IDR Process. ▮▮▮▮▮▮▮▮▮▮, Initial Payment or Notice Date: 10/20/2024, Open Negotiation Notice

112.    Zotec's misrepresentations caused an award to be rendered against BCBSTX in the amount of $▮▮▮▮▮.

113.    This award is over 690% higher than the QPA (*i.e.*, the median in-network rate) for these same services.

114.    On top of this, BCBSTX also incurred administrative expenses of $▮▮▮.

115.    All of the foregoing was caused by Zotec's fraudulent and false misrepresentations in the IDR Process.

### *DISP-3095991 & DISP--3105200 (Duplicate Submission and Award)*

116.    On November 26, 2024, Lone Star Emergency Associates LLC ("Lone Star") provided services for BCBSTX member.

117.    Thereafter, on January 27, 2025, BCBSTX adjudicated and allowed a claim for these services for $███, pursuant to a rate that Lone Star agreed upon with BCBSTX .

118.    On February 5, 2025, Zotec initiated an Open Negotiations Period for BCBSTX's adjudication of the claim for Lone Star's services.

119.    However, because Lone Star and Zotec had agreed to the reimbursement rate for these services, they were ineligible for the IDR Process. Accordingly, On February 18, 2025, BCBSTX sent a letter stating that "The No Surprises Act IDR Process is not applicable":



**BlueCross BlueShield** of Texas

February 18, 2025
RE: ███████████████
HCSC CMS Registry Number:
CMS Registry Number:
Dear Lone Star Emergency Associates:

We have received your request on February 05, 2025, disputing claim number

███████████████

Items or services billed do not qualify for the NSA process. Eligible services will be noted on your Provider Claims Summary.

After further review, it has been determined the claim has been paid using a price negotiated directly with a non-par provider. The No Surprises Act IDR Process is not applicable.

Claims for the following services, which are not subject to a specified state law, may be eligible for payment review under NSA if you don't have a contract with us.

· Emergency services or stabilization for an emergency
· Services provided by non-participating providers at a contracted facility
· Air ambulance Services

Sincerely,
Independent Dispute Resolution Team

120.    Nevertheless, on April 28, 2025, Zotec initiated a formal IDR Process for these services. Under the NSA's timing requirements, this formal IDR Process was initiated more than 50 days after the deadline to do so.

121.    Then, the very next day, Zotec initiated *another* IDR Process for *these same services*. This was obviously improper because a service can only be subject to IDR Process once—not twice, let alone twice simultaneously.

122.    BCBSTX submitted objections in the IDR Processes explaining, among other things, that the services were not subject to the NSA:

> Objection to the following items or services. The claim has been paid using a price negotiated directly with a non-par provider prior to the initial payment. Therefore, this submission is not eligible for the Federal IDR Process. █████████

123.    Despite this, Zotec procured an award against BCBSTX on July 25, 2025 from the first IDR Process that it initiated in the amount of $██. This amount is more than 50% the QPA (i.e., the median in-network rate) for these same services. On top of this, BCBSTX also had $██ in administrative fees imposed on it.

124.    Then, several days later on August 1, 2025, Zotec procured **another award** against BCBSTX from the second IDR Process it initiated for the **same services** in the amount of $██. On top of this, BCBSTX also had another set of $██ administrative fees imposed on it.

125.    Thus, in total, BCBSTX had duplicate awards and sets of administrative fees in the amount of $███ imposed on it for the same services that should never have been subject to the IDR Process in the first place.

126.    All of the foregoing was caused by Zotec's fraudulent and false misrepresentations in the IDR Process.

*        *        *

127.    The foregoing are examples of the many thousands of awards for ineligible services or items in the IDR Process that Zotec has caused against BCBSTX.

### ZOTEC PROCURES AWARDS THAT EXCEED BILLED CHARGES ON INELIGIBLE CLAIMS AND SERVICES

128.    The reason for Zotec's abuse of the IDR Process is clear—they are getting a massive windfall.

129.    Congress intended to make the median in-network rate negotiated with participating providers—known as the QPA—a key metric in the IDR process, as opposed to a

provider's "billed charge," an arbitrary amount for an item or service unilaterally set by the provider. *See* Requirements Related to Surprise Billing: Part II, 86 Fed. Reg. at 55,996 (Oct. 7, 2021) (median contracted rates typically represent reasonable market values because they "are established through arms-length negotiations between providers and facilities and plans and issuers (or their service providers)").

130.    Congress specifically noted in enacting the NSA that it was looking to combat "inflated out-of-network prices." H.R. REP. 116-615, 53 (Dec. 2, 2020).

131.    Despite this intent, Zotec has obtained awards in the IDR Process that are often significantly higher than the QPA and, at times, higher than the underlying providers' own billed charges for the services being disputed.

132.    There is no legitimate basis for a provider to obtain an award at an amount higher than what they charge for a given service.

133.    As one example, on March 12, 2025, HNI Physician Services of Texas Inc. ("HNI") rendered services to a BCBSTX member. HNI's billed charges for these services were $▇▇.

134.    BCBSTX adjudicated HNI's claim for these services and paid $▇▇ to HNI—the full amount that HNI charged. BCBSTX also provided HNI with a provider claims summary that denoted the claim type was "MR"—indicating a Medicare health benefits plan:



135.    The NSA IDR Process does not apply to Medicare. Upon information and belief, Zotec also had the foregoing information available to it. Nevertheless, on May 27, 2025, Zotec

initiated an IDR Process (DISP-3295136) for this service by making false representations that the services were eligible for the IDR Process when, in fact, Zotec knew that to be false or should have known it was false.

136. Even though HNI's billed charges for these services were $███, and even though BCBSTX *already paid that amount*, Zotec then sought—and received an award of—$████:

> **Determination 1**
>
> After considering all permissible information submitted by both parties, Federal Hearings and Appeals Services, Inc. has determined that the out-of-network payment amount of $████ offered by HNI PHYSICIAN SERVICES OF TX is the appropriate out-of-network rate for the item or service ████ on this claim ████ under this dispute.
>
> Federal Hearings and Appeals Services, Inc. based this determination on a review of the following:
>
> HNI PHYSICIAN SERVICES OF TX submitted an offer of ████

137. Not only is this award more than $███ higher than HNI's billed charges (effectively charging two different prices for the same product or service solely because an insurer would be ordered to pay all or part of the higher price) and the QPA for this service, but BCBSTX also had to pay $████ in administrative fees—all for a service that was ineligible for the IDR Process in the first place.

138. This is just another example of the IDR Process going drastically wrong, due to Zotec's abuse of the process.

## ZOTEC'S "STRATEGIC" BATCHING TACTICS

139. Zotec's intent in carrying out this scheme is also demonstrated through the manner in which it initiates Open Negotiations and formal IDR disputes—both submitting large numbers of disputes at the same time in the same IDR Process and submitting disputes on or around holidays. Upon information and belief, these tactics are undertaken in order to (1) limit BCBSTX's

time to respond to and contest IDRs and (2) to overwhelm IDREs ability to assess and raise eligibility issues.

140.    The NSA permits "multiple qualified IDR dispute items and services . . . to be considered jointly as part of a single [IDR] determination." 42 U.S.C. § 300gg-111(c)(3)(A). *See also* 245 C.F.R. § 149.510(a)(2)(i) ("Batched items and services means multiple qualified IDR items or services that are considered jointly as part of one payment determination by a certified IDR entity for purposes of the Federal IDR process.").

141.    Submitting multiple items and services to be jointly considered as part of a single IDR Process is colloquially referred to as "batching."

142.    The purpose of batching is to "encourag[e] the efficiency (including minimizing costs) of the IDR process." 42 U.S.C. § 300gg-111(c)(3)(A).

143.    However, entities like Zotec have wielded batching to overwhelm a health plan's ability to meaningfully contest eligibility and to impede an IDRE's ability to rule services and items as ineligible.

144.    These tactics impose significant administrative burdens on BCBSTX and ultimately result in BCBSTX incurring administrative fees and facing IDR awards on ineligible services.

145.    On over 530 occasions, Zotec has initiated BCBSTX-related IDR Processes that each contain *more than 100* different services batched together. On average, Zotec batches 66 different items or services together in a single IDR dispute.

146.    In one example, on November 4, 2024, Zotec initiated an IDR Process (DISP-975220) for 150 different services. The vast majority of these services were ineligible for the IDR Process, including because a state-specified law applied and because they were untimely.

Nevertheless, Zotec was able to extract an additional $██████ from BCBSTX in the IDR Process for these ineligible services by batching so many services together that it prevented BCBSTX from meaningfully objecting and, upon information and belief, inhibited the IDRE's ability to ascertain that the services were ineligible. On top of this inflated sum, BCBSTX also incurred administrative expenses of $█████.

147.    Zotec also stockpiles and then initiates large volumes of open negotiations and formal IDRs around holidays when payors face staffing and other challenges to further inhibit BCBSTX's time and ability to adequately contest eligibility within the narrow timeframe permitted under the NSA.

148.    For instance, on Christmas in 2023, Zotec initiated Formal IDR Processes for 110 BCBSTX-related batched items and services. In the next three days after Christmas, Zotec initiated Formal IDR Processes for another 1,484 BCBSTX-related items and services. For context, prior to initiating IDRs on or around this Christmas period, Zotec had last initiated IDR Processes against BCBSTX in August of 2023.

149.    In 2024, Zotec initiated Formal IDR Processes for 247 services against BCBSTX on May 23, 2024—the Friday of Memorial Day Weekend. Zotec then stockpiled items and services and did not initiate another Formal IDR Process against BCBSTX until July 6, 2024—the Saturday of Independence Day Weekend—with 143 different services being challenged.

**ZOTEC'S PRACTICES CONTIUNUE DESPITE BCBSTX ALERTING ZOTEC TO THE SUBMISSION OF INELIGIBLE DISPUTES**

150.    BCBSTX raised many of these concerns directly with Zotec.

151.    In addition to routinely notifying Zotec of its ineligible submissions during open negotiations, on May 12, 2025, BCBSTX sent Zotec a letter providing notice that Zotec's "submissions contain a large volume of items and services that are not eligible for the IDR

process." The letter included a report detailing a large number of ineligible submissions made by Zotec. BCBSTX noted how "these improper submissions have harmed [BCBSTX] and other group health plans by, among other things, causing them to incur nonrefundable administrative and/or IDRE fees" and that BCBSTX would bring "Zotec's improper submissions to the attention of CMS."

152.    In response, Zotec wrote later that day that it is "going to need examples of what you are talking about" and that "there is [sic] no indicators that state if this is eligible for a state [IDR] process or for a federal [IDR] process."

153.    BCBSTX replied on May 22, 2025 by explaining how providers (and thus Zotec, working on the providers' behalf) can "refer to the PCS [provider claim summary]" provided for each claim "to ensure only eligible NSA qualified items and services are included in your requests for open negotiation and IDR, so that your attestations of eligibility are accurate going forward."

154.    On July 2, 2025, BCBSTX also offered for Zotec to "reach out" if Zotec wanted to "schedule a call" or if Zotec still had "questions after reviewing this email"—even offering to send an invitation for a virtual meeting on July 15, 2025 at 1:00pm CT.

155.    Zotec never responded to this message or otherwise followed up to schedule a call with BCBSTX.

156.    Worse yet, Zotec continued its practice of submitting ineligible services and items into the IDR Process. Zotec also continued to employ cumbersome batching practices to inhibit BCBSTX's ability to meaningfully review and object to its ineligible submissions.

## COUNT I
## FRAUD

157.    BCBSTX incorporates by reference as if fully set forth herein the allegations in the preceding paragraphs.

158.    As the examples herein show, Zotec repeatedly misrepresented material facts regarding the eligibility and information related to the eligibility of claims it submitted to the IDR Process, including entering misinformation into the IDR portal and completing and submitting forms. These misrepresentations include but are not limited to the applicable health benefit plan, the dates the underlying medical services were provided, whether certain prerequisites had been satisfied and the dates of the same, whether the claim was duplicative of a prior dispute, and that the provider filed an appeal with the health plan.

159.    Zotec also falsely attested in the Notice of Initiation form, described above, that the IDR items or services were "within the scope of the Federal IDR process" when, in fact, they were not.

160.    These misrepresentations were made by Zotec as result of a collective strategy, plan, and scheme.

161.    Zotec made these misrepresentations directly and/or indirectly to BCBSTX, the federal government (U.S. Department of Health and Human Services, the Department of Labor, and the Department of the Treasury) (hereinafter, the "Federal Government Agencies"), and IDREs.

162.    Zotec's misrepresentations were material. But for its misrepresentations, Zotec would not have been able to initiate (or prevail in) the IDR Process for ineligible items and services.

163.    Zotec made these misrepresentations with the intent of inducing BCBSTX, the Federal Government Agencies, and IDREs to rely upon them.

164.    Zotec intended for BCBSTX to be induced into believing the underlying items and services were eligible for the IDR Process.

165.    Further, Zotec intended for those overseeing the IDR Processes—e.g., the Federal Government Agencies and IDREs—to rely upon Zotec's misrepresentations, and then take actions that were detrimental to BCBSTX as a result of this reliance. Specifically, Zotec intended that these entities and individuals allow the IDR Process to proceed on ineligible claims, and issue awards on ineligible claims.

166.    Had Zotec not made these misrepresentations, the IDR Process would not have proceeded; Zotec would not have been able to obtain awards for providers on ineligible claims; and BCBSTX would not have been forced to incur unnecessary administrative fees, overhead costs, and other expenses to respond to Zotec's ineligible IDR Process submissions.

167.    As for the misrepresentations made to those overseeing the IDR Process, the Federal Government Agencies and IDREs reasonably and justifiably relied upon Zotec's submission of information and attestations that the underlying claims were eligible for the IDR Process. Once the IDR Process was allowed to proceed (as a result of Zotec's misrepresentations to third-parties), BCBSTX was forced to participate in the IDR Process, and to rely upon Zotec's misrepresentations.

168.    Furthermore, the impact of Zotec's fraudulent misrepresentations on BCBSTX was exacerbated by Zotec's strategic abuse and manipulation of the IDR process, including through excessive batching. Zotec's self-proclaimed "strategic" batching tactics are intended to, and did, prevent BCBSTX from meaningfully contesting eligibility for many IDR submissions, as well as

hinder an IDRE's ability to rule out ineligible services and items. This resulted in IDREs making inaccurate eligibility determinations based on the IDREs' reliance on Zotec's misrepresentations regarding eligibility, and the abbreviated timeline for both health plans and IDREs to make such eligibility determinations.

169.    BCBSTX reasonably and justifiably relied upon Zotec's misrepresentations. After Zotec successfully induced the IDRE to rely upon its inaccurate eligibility attestations, BCBSTX was forced to rely upon Zotec's misrepresentations regarding claim eligibility. BCBSTX was the end target of Zotec's fraud, as Zotec specifically targeted BCBSTX's IDR disputes, with the intention of injuring BCBSTX and extracting unearned monies from BCBSTX through fraudulently-acquired IDR awards. BCBSTX was forced to rely on Zotec's fraudulent submissions, as BCBSTX had no other choice—the IDR Process does not allow for traditional "appeals," and if BCBSTX stopped participating in the Process, a default award would simply be entered against it.

170.    Zotec made these misrepresentations with full knowledge of their falsity or with reckless disregard for their truth. Zotec's knowledge of falsity is illustrated throughout its actions and inactions, including but not limited to the following:

171.    Zotec had all necessary information available to it, such as the type of health plan and the date the services were rendered, to determine whether an item or service was ineligible for the IDR Process. Zotec ignored that information and instead submitted and attested to affirmative misrepresentations regarding the claims' eligibility in order to fraudulently initiate an Open Negotiation period pursuant to the IDR Process.

172.    Zotec's misrepresentations also induced IDREs to permit disputes to move forward, despite a claim's ineligibility for the IDR Process.

173.    Zotec touts itself as an expert in the IDR Processes, and publicly represents that it "assesses each case for eligibility under the No Surprises Act and relevant state regulations." Zotec therefore knows and understands that the items and services on which it is initiating disputes are ineligible.

174.    Zotec strategically bulk batches the submission of ineligible claims for the IDR Process to manipulate the IDR system to its benefit and to the detriment of health plans, taking advantage of the extremely limited time frame that a health plan has to evaluate each claim's eligibility—particularly when they are batched in such mass numbers as Zotec has done. This severely limited BCBSTX's ability to contest eligibility of the ineligible claims that Zotec initiates disputes on. Zotec also knows that these large batches inhibit the IDREs' ability to assess whether services are eligible.

175.    As a direct and proximate result of these misrepresentations, Zotec caused BCBSTX to suffer damages in an amount to be proven at trial, including without limitation: IDR awards fraudulently procured against BCBSTX by Zotec for ineligible claims; administrative and IDRE fees and costs imposed on BCBSTX as part of the IDR Processes for ineligible claims; and costs for the overhead and resources necessary for BCBSTX to respond to IDR Processes initiated by Zotec for ineligible claims.

### COUNT II
### NEGLIENT MISREPRESENTATION

176.    BCBSTX incorporates by reference as if fully set forth herein the allegations in the preceding paragraphs.

177.    As the examples above demonstrate, Zotec repeatedly negligently misrepresented material facts regarding the eligibility of claims it submitted to the IDR Process, including while entering  misinformation  into  portals  and  completing  and  submitting  forms.  These

misrepresentations include but are not limited to the applicable health benefit plan, the dates the underlying medical services were provided, whether certain prerequisites had been satisfied, whether the claim was duplicative of a prior dispute, and that the provider filed an appeal with the health plan.

178.    Zotec negligently misrepresented in the Notice of Initiation form, described above, that the items or services were "within the scope of the Federal IDR process" when they were not.

179.    These misrepresentations were made by Zotec on behalf its provider clients as a result of Zotec's strategy, plan, and scheme.

180.    Zotec made these misrepresentations directly or indirectly to BCBSTX, the Federal Government Agencies, and IDREs.

181.    Zotec's negligent misrepresentations were concerning existing, material facts. But for its misrepresentations, Zotec would not have been able to initiate IDR disputes for ineligible claims.

182.    Had Zotec not made these misrepresentations, the IDR Process would not have proceeded; the IDREs would not have inaccurately concluded that an ineligible claim was actually eligible; Zotec would not have been able to obtain awards on the ineligible claims; and BCBSTX would not have incurred IDRE and administrative fees, unnecessary overhead costs, and other expenses to respond to Zotec's ineligible IDR disputes.

183.    Zotec made these negligent misrepresentations in the course of its business and failed to exercise reasonable care or competence because Zotec was aware of the statements' falsity.

184.    Zotec has the relevant information available to it, such as the type of health plan and the date the services were rendered. Zotec submitted and attested to the accuracy of completely

different information so that it could fraudulently initiate Open Negotiation periods and formal IDR disputes.

185.    Zotec touts itself as an expert in the IDR Processes, and publicly represents that it "assesses each case for eligibility under the No Surprises Act and relevant state regulations." Zotec therefore knew or should have known that the claims it was initiating disputes for were ineligible for the respective IDR Process.

186.    Zotec has initiated disputes in both the IDR Process and the Texas State IDR Process for the same service, when a service can only inherently be ineligible for one of the two Processes.

187.    Zotec manipulated the IDR batching system to strategically submit services and items *en masse* into the IDR Process, intending to (and succeeding in) limiting the IDREs' and BCBSTX's ability to review and contest eligibility of the ineligible claims.

188.    BCBSTX reasonably and justifiably relied upon Zotec's misrepresentations. BCBSTX was unable to meaningfully contest eligibility on all of the Open Negotiation and formal IDR disputes initiated by Zotec because, in part, of the "strategic" batching tactics discussed herein, and the extremely short time frame the IDR process affords providers to make such objections. Thus, BCBSTX has to reasonably and justifiably rely upon Zotec's submission of information and attestations that the underlying services and claims were eligible for the IDR Process.

189.    As for the misrepresentations made to those overseeing the IDR Process, the Federal Government Agencies and IDREs reasonably and justifiably rely upon Zotec's submission of information and attestations that the underlying services and claims were eligible for the IDR Process. Once the IDRE made a determination of eligibility on Zotec's ineligible claims, based

upon the IDRE's reliance upon Zotec's misrepresentations regarding those claims, the IDR Process was allowed to proceed. BCBSTX was then forced to rely upon Zotec's misrepresentations and to participate in the IDR Process.

190.    As a direct and proximate result of these misrepresentations, Zotec caused BCBSTX to suffer damages in an amount to be proven at trial, including without limitation: IDR awards fraudulently procured against BCBSTX by Zotec for ineligible claims; IDRE and administrative fees and costs imposed on BCBSTX as part of the IDR Processes; and forcing BCBSTX to bear the costs of the overhead and resources necessary to respond to IDR Processes initiated by Zotec for ineligible claims.

### COUNT III
### FRAUDULENT INDUCEMENT

191.    BCBSTX incorporates by reference as if fully set forth herein the allegations in the preceding paragraphs.

192.    Zotec submitted false and inaccurate information regarding the eligibility and information related to the eligibility of services for the IDR Processes.

193.    These misrepresentations include but are not limited to the applicable health benefit plan, the dates the underlying medical services were provided, whether certain prerequisites to eligibility for the IDR Processes had been satisfied, whether the service was duplicative of a prior dispute, and that the provider filed an appeal with the health plan.

194.    Zotec further falsely attested that items or services were "within the scope of the Federal IDR process" when, in fact, they were not.

195.    Zotec made these fraudulent misrepresentations to BCBSTX, the Federal Government Agencies, and IDREs.

196.    These misrepresentations deceived the IDREs, inducing them to attest that the claims in dispute were eligible for the IDR Process, which allowed Zotec to formally initiate the IDR Processes.

197.    Zotec intended that its false misrepresentations would be transmitted to BCBSTX, and that BCBSTX would act and rely on the misrepresentations. Zotec was aware that BCBSTX functionally had no choice in the matter.

198.    Had Zotec not made these misrepresentations, the IDREs would not have attested to the claims' eligibility, and the IDR Processes would not have proceeded; Zotec would not have been able to obtain awards on the ineligible claims; and BCBSTX would not have incurred unnecessary IDRE and administrative fees, overhead costs, and other expenses to manage Zotec's ineligible IDRs.

199.    BCBSTX reasonably and justifiably relied upon Zotec's misrepresentations. BCBSTX is unable to contest eligibility on all of the IDR disputes initiated by Zotec because, in part, of the batching tactics discussed herein. Thus, BCBSTX has to reasonably and justifiably rely upon Zotec's submission of information and attestations that the underlying items and services were eligible for the IDR Process.

200.    As for the misrepresentations made to those overseeing the IDR Process, Federal Government Agencies and IDREs reasonably and justifiably relied upon Zotec's submission of information and attestations that the underlying items and services were eligible for the IDR Process. Once the IDR Process was allowed to proceed, as a result of Zotec's misrepresentations to third-parties, BCBSTX was forced, by statute, to rely upon Zotec's misrepresentations and to participate in the IDR Process.

201.    This induced BCBSTX to unnecessarily proceed through the IDR Process on ineligible claims.

202.    This further induced BCBSTX to unnecessarily come to settlement agreements with Zotec on certain ineligible claims submitted into the IDR Process.

203.    But for Zotec's misrepresentations, BCBSTX would not have been fraudulently induced to take these acts. Indeed, there would be no ineligible IDRs initiated but for Zotec's misrepresentations.

204.    Moreover, BCBSTX would not have settled or otherwise engaged in negotiations on ineligible claims but for Zotec's misrepresentations that such claims were eligible for the IDR Process.

205.    As a direct and proximate result of these misrepresentations, Zotec caused BCBSTX to suffer damages in an amount to be proven at trial, including without limitation:  IDR awards fraudulently procured against BCBSTX by Zotec for ineligible claims; settling claims under the false veneer of those claims being eligible for the IDR Processes; IDRE and administrative fees and costs imposed on BCBSTX as part of the IDR Processes; and forcing BCBSTX to bear the costs of the overhead and resources necessary to respond to IDR Processes initiated by Zotec for ineligible claims.

**COUNT IV**
**MONEY HAD AND RECEIVED**

206.    BCBSTX incorporates by reference as if fully set forth herein the allegations in the preceding paragraphs.

207.    Zotec caused BCBSTX to wrongfully pay providers for improper awards and/or settlements related to claims that were ineligible for the IDR Process.

208.    Zotec received a portion of these payments from the providers.

209.    BCBSTX would not have paid those claims but for the wrongful conduct of Zotec, as described herein.

210.    The funds paid by BCBSTX for improper IDR awards should be returned in good conscience. Accordingly, BCBSTX seeks the return of money had and received by Zotec due to Zotec's improper and fraudulent conduct.

## COUNT V
## DECLARATORY AND INJUNCTIVE RELIEF

211.    BCBSTX incorporates by reference as if fully set forth herein the allegations in the preceding paragraphs.

212.    BCBSTX seeks a declaration that Zotec's conduct in submitting false attestations and initiating IDR Processes for ineligible items or services is unlawful. BCBSTX additionally seeks a declaration that IDR awards for such ineligible IDR items and or services are not binding. It further seeks an injunction prohibiting Defendants from continuing to submit false attestations and initiate IDR Processes for items or services that are not eligible for IDR, or from seeking to enforce non-binding awards entered on items and services not eligible for IDR.

213.    There is no adequate remedy at law to prevent the irreparable and ongoing harm caused by Defendants' conduct.

## PRAYER FOR RELIEF

WHEREFORE, BCBSTX respectfully requests a judgment in its favor granting the following relief:

    a.    An award of compensatory damages in an amount to be proven at trial;

    b.    An award of punitive and exemplary damages;

    c.    Equitable and declaratory relief, as requested herein;

    d.    Costs;

e.    Reasonable attorney fees;

f.    Prejudgment and post-judgment interest; and

g.    An award of any other relief in law or equity that the Court deems just and

proper.

Dated: December 18, 2025

By: /s/ Kelly B. Tidwell

**PATTON, TIDWELL & CULBERTSON**

Kelly B. Tidwell
Geoffrey P. Culbertson
2800 Texas Boulevard
PO Box 5398
Texarkana, TX 75505
Telephone: (903) 792-7080
Facsimile: (903) 792-8233
kbt@texarkanalaw.com
gpc@texarkanalaw.com

&

**ROBINS KAPLAN LLP**

Jamie R. Kurtz* (Lead Attorney)
JKurtz@RobinsKaplan.com
Nathaniel J. Moore*
NMoore@RobinsKaplan.com
John K. Harting
JHarting@RobinsKaplan.com
Kyle D. Nelson*
KNelson@RobinsKaplan.com
Jacqueline R.D. Fielding*
JFielding@RobinsKaplan.com
Lindsay K. Dreyer*
LDreyer@RobinsKaplan.com
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
P: 612.349.8500

*Application for *pro hac vice* admissions
forthcoming

*Attorneys for Plaintiff Blue Cross Blue Shield of
Texas*

-51-